F I L E D
CHARLOTTE, N. C.

APR 0 5 2007

U. S. DISTRICT COURT
W. DIST. OF N. C.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

MISC. NO. 3:07MC43-MU

| | |
|---|---|
| IN RE: REAL PROPERTY LOCATED AT )<br>1716 AND 1818 ROUND HILL CHURCH )<br>ROAD, TRAPHILL, NORTH CAROLINA, )<br>AS MORE PARTICULARLY DESCRIBED )<br>IN A DEED RECORDED AT BOOK 682, )<br>PAGE 4, IN THE WILKES COUNTY )<br>PUBLIC REGISTRY )<br>_____ )<br>)<br>FILE IN GRANTOR INDEX UNDER: )<br>**EASTEEN BAUGESS PRUITT; CURTIS** )<br>**HAMPTON PRUITT** )<br>_____ ) | **ORDER**<br>**AND LIS PENDENS** |

    WHEREAS, the United States of America, by and through Special Agent Todd Elmore of the Bureau of Immigration and Customs Enforcement, has presented an affidavit to the Court alleging that the above-captioned property was involved in or facilitated controlled substances trafficking and/or was the proceeds of such criminal activity, in violation of 21 U.S.C. §801 et seq.; and,

    WHEREAS, the Court, having reviewed the affidavit, finds that there is probable cause to believe that the property was involved in or facilitated controlled substances trafficking and/or was the proceeds of such criminal activity, in violation of 21 U.S.C. §801 et seq.; and,

    WHEREAS, upon this finding of probable cause, the property may be subject forfeiture to the United States pursuant to 21 U.S.C. §881, and the government is entitled to record a lis pendens to give public notice of the government's forfeiture interest and potential civil and/or criminal forfeiture claim against the property;

THEREFORE, the United States is directed forthwith to file this Order and Lis Pendens with the appropriate state or local public depository to prevent the flight or transfer of the property so that the United States may initiate action to adjudicate forfeiture of the property; and,

ALL WHO READ THIS ORDER AND LIS PENDENS TAKE NOTICE that the property may be subject to forfeiture to the United States in a present or future criminal or civil in rem action before this Court, and any person who has a question as to this action should contact:

> United States Attorney
>     for the Western District of North Carolina
> Attn: William A. Brafford
> 227 West Trade Street, Suite 1650
> Charlotte, NC 28202
> (704) 344-6222

This the 5th day of April, 2007.

_____
UNITED STATES MAGISTRATE JUDGE

**TO THE RECORDER OF THIS INSTRUMENT: MAIL ANY AND ALL RECORDED COPIES TO THE UNITED STATES ATTORNEY FOR THE WESTERN DISTRICT OF NORTH CAROLINA AT THE ABOVE ADDRESS.**

# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NORTH CAROLINA

## AFFIDAVIT

## INTRODUCTION

W. Todd Elmore, Special Agent of the Department of Homeland Security, United States Immigration and Customs Enforcement (ICE), being duly sworn, states as follows:

1. Your affiant is an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered to conduct investigations of, and to make arrests for, the offenses enumerated in Title 18, United States Code, Section 2516. Your affiant has been employed as a criminal investigator with ICE since October 2002. Your affiant was previously employed as a criminal investigator with the Internal Revenue Service – Criminal Investigation for approximately 15 years. Your affiant has been assigned the case agent of over 300 federal investigations involving narcotics trafficking organizations and their related criminal activity. Such investigations have focused on international narcotics trafficking involving the unlawful importation, transportation, and distribution of controlled substances and related money laundering activities. Through investigations and training, your affiant has become familiar with the methods and schemes employed by narcotics dealers to obtain, smuggle and distribute illegal narcotics. Your affiant has also become familiar with and utilized a wide variety of investigative techniques, including the use of pen registers and trap and trace devices and the interception of wire communications. Your affiant is currently assigned to the Charlotte, North Carolina

1

office of ICE and is currently the assigned case agent of the investigation referred to in this affidavit.

2. The affiant makes this affidavit in support of an application for a search warrant, criminal complaint, and Lis Pendens concerning federal felony offenses enumerated in Section 2516 of Title 18, United States Code, to wit, the importation and distribution of controlled substances, the possession of controlled substances with intent to distribute, in violation of Title 21, United States Code, Sections 841(a)(1), 843(b), 846, (hereinafter referred to as "offenses"). The affiant believes there is probable cause for the following:

- A search warrant for the residence and outbuildings located at 1818 Round Hill Church Road, Traphill, North Carolina;
- A criminal complaint and arrest warrant for Curtis Hampton Pruitt;
- A Lis Pendens for the real property known as 1818 Round Hill Church Road, Traphill, North Carolina

3. Since this affidavit is being submitted for the limited purpose of seeking a search warrant, arrest warrant and Lis Pendens, each and every fact learned during the course of this investigation has not been set forth. Facts not set forth herein are not being relied upon in reaching the conclusion that these orders should be issued. Nor is it requested that the Court rely upon any facts not set forth herein in reviewing this affidavit.

4. During December 2003, Captain John Summers of the Wilkes County Sheriff's Office received information from a confidential informant[1] (hereinafter referred to as CI) concerning the drug distributions of Curtis Hampton Pruitt. The CI indicated that Pruitt was previously convicted in Federal Court for drug violations and was subsequently released from prison and supervised release[2]. Since being released from federal supervised release, Pruitt had started distributing cocaine and the CI had purchased cocaine from Pruitt since he was released from prison. The CI indicated that he could introduce an undercover agent to Pruitt for the purpose of purchasing cocaine. The CI further stated that Pruitt owns a farm located at 1818 Round Hill Church Road, Traphill, North Carolina and that Pruitt had remodeled the barn on the farm into his primary residence. The CI stated that he had been at Pruitt's property on numerous occasions and knows that Pruitt uses the outbuildings located on his property to store cocaine. The CI stated that Pruitt has numerous firearms and had built a hidden room in his residence to conceal the firearm because he is convicted felon. The CI has not seen the hidden room but has seen numerous firearms at the residence.

---

1  The Confidential Informant previously provided information to Captain Summers that resulted in the conviction of two individuals in North Carolina State Court for felony drug charges. The information provided by the CI regarding the matters in this investigation has been corroborated by information from other Wilkes County Sheriff's Office confidential informants. The Confidential Informant is considered reliable by law enforcement.

2  A Check of the records of the National Crime Information Center (NCIC) indicates that Curtis Hampton Pruitt was arrested 9/26/95 for federal drug charges. Pruitt was subsequently sentenced in the Western Judicial District of North Carolina to 37 months in prison and four years supervised release. Pruitt was released from supervised release on January 29, 2002.

5. Based on the cooperation of the CI, the following undercover activities were conducted with Curtis Hampton Pruitt. Unless otherwise noted, all cocaine seized in the undercover activities was turned over to law enforcement officers and was either field tested positive for cocaine or was confirmed to be cocaine by the North Carolina State Bureau of Investigation Laboratories:

   a. On Tuesday, December 30, 2003, at approximately 1:55 pm, CI and Iredell County Sheriff's Detective Kevin Black, acting in an undercover capacity, went to the residence of Curtis Hampton Pruitt for the purpose of purchasing cocaine from Curtis Hampton Pruitt. Black observed that the residence was a two story barn with a gravel drive located at 1818 Round Hill Church Road, Traphill, North Carolina (hereinafter referred to as "Pruitt's residence"). Upon arrival at Pruitt's residence, Black and the CI met Pruitt's girlfriend, Tammy Plowman, who was sitting in a wheelbarrow outside. After speaking with Plowman, Black and the CI went inside the upstairs portion of the barn, which was made into living quarters. Pruitt and others were installing a wood floor and general conversation was made regarding the floor, deer hunting, and other topics. During this time, the CI and Pruitt went to the side and asked Pruitt about obtaining cocaine and Pruitt stated that he could not get to it right now because his girlfriend was around and she would see where Pruitt stored the cocaine. Pruitt told the CI to come back Friday. Pruitt stated that he was going to move his girlfriend out and would be able to do something then.

   b. On Friday, January 2, 2004, at approximately 10:45 a.m., Black and the CI went to Pruitt's residence. When Black and the CI arrived at Pruitt's residence, Pruitt was outside feeding some of the horses in the barn portion of the residence. Pruitt told the CI that he could not give the CI any cocaine because Pruitt's girlfriend was there.

   c. On Friday, January 30, 2004 at approximately 3:16 pm, Black and the CI went to Pruitt's residence to obtain cocaine. Sometime after they arrived, Pruitt left the residence and returned to the residence with the cocaine. Pruitt had the CI follow him down to the barn portion of the residence. The CI obtained one ounce of cocaine from Pruitt in the barn section of the residence for $1,300.

   d. On Tuesday February 10, 2004 at approximately 4:10 pm, Black and the CI went to Pruitt's residence to obtain cocaine. Black and the CI went in the residence and spoke with Pruitt. The CI asked Pruitt if he had cocaine and Pruitt said he only had one ounce left, that he did not think that they were coming and had sold some of the cocaine to other people. Pruitt went and

4

obtained the one ounce of cocaine and provided it to the CI. The CI went to Black and got the money and paid Pruitt $1,300 for the cocaine.

e. On Wednesday, February 18, 2004 at approximately 4:51 pm, Black and the CI went to Pruitt's residence to purchase cocaine. Black and the CI were unable to obtain cocaine because Pruitt's girlfriend, Tammy Plowman, was there. Pruitt stated that if she found out where he was storing his cocaine, she would steal it from him. Pruitt told the CI to come back the next day and he will have it available for them.

f. On Thursday February 19, 2004 at approximately 4:34 pm, Black and the CI went to Pruitt's residence and were met outside by Pruitt. They walked around the left side of the residence to a green Honda four wheel All Terrain Vehicle (ATV). Pruitt had the CI get on the ATV with him. They left and returned 10-15 minutes later. The CI asked for $2,600 from Black. Black gave the money to the CI and the CI gave it to Pruitt who then began counting it. Pruitt asked if they had seen any strange vehicles in the area and that he thought the "Feds" were watching him since Amanda Durham's arrest, as he thought she might be telling on him (Amanda Durham was prosecuted in the Western District of North Carolina in 2003 for drug charges. She was sentenced to a 84 month prison sentence). Pruitt said if they needed any more cocaine and he was not around, the CI would know where it was. Black and the CI then left and the CI told Black that Pruitt had taken him to an old truck parked in front of a vacant house beside Pruitt's residence and got two ounces of cocaine out from under the dash of the vehicle. Pruitt told the CI that if he was not around to get what he needed from there and to leave money in its place.

g. On Wednesday March 10, 2004 at approximately 4:30 pm, Black and the CI went to Pruitt's residence. The CI went to the door and Pruitt came to the door and Black then went toward the residence. Pruitt called the CI to the side. As the CI got up to go outside with Pruitt, Black gave the CI $2,600 and the CI and Pruitt then went on the porch where Pruitt pulled out two bags of cocaine (two ounces) out of his pocket and handed them to the CI. The CI then gave Pruitt the money and they went back inside. After some additional conversation, Black and the CW left.

h. On Wednesday March 17, 2004 at approximately 4:30 pm, Black and the CI went to Pruitt's residence and Pruitt came from around the side of the residence and spoke with them. While speaking with them, another white male known as Dale Cleary came up to Pruitt and was wanting to buy some cocaine. Pruitt had the CI follow him to the horse stall area of the barn where he got two plastic bags (two ounces) of cocaine from a metal box that was used to store welding rods. The CI looked in the box and saw numerous other bags of what appeared to be cocaine. The CI gave Pruitt $2,600 and asked Pruitt if he could cut the price any if they bought larger quantities and Pruitt told the CI to call him later and they would discuss it. The CI and Black then left.

5

i. On Wednesday April 7, 2004 at approximately 4:52 pm, Black and the CI went to Pruitt's residence and spoke to Pruitt in the residence about various things and then went down to the stable area of the residence. Pruitt called the CI over to the feed room area and reached into a round metal container and pulled out three separate vacuum-sealed bags each containing a clear plastic bag of cocaine. The CI told Pruitt they just wanted one (ounce) and Pruitt put the other two back. The CI observed what appeared to be at least 25 ounces of cocaine packaged in a similar fashion inside the can. Pruitt and the CI walked back over to Black and the CI asked for the money. Black pulled out $1,000 dollars and handed it to the CI who laid it down and in a couple of minutes Pruitt picked it up and put it in his pocket. During the course of this meeting, the CI told Pruitt they would like to get five or more ounces next time if the price was right and Pruitt said it would be $1,000 an ounce or maybe a little less.

j. On Wednesday October 25, 2006 at approximately 4:57 pm, Black and the CI[3] went to Pruitt's residence to purchase cocaine. Black stated that Pruitt retrieved one ounce of cocaine from an outbuilding beside the barn (Pruitt's residence). Pruitt charged $1,200 for the ounce of cocaine they received. Black indicated that Pruitt had a pistol in his rear pants pocket during the transaction. While talking to the CI, Pruitt stated that he and D.C. Cole had purchased seven kilograms of cocaine from someone in Union Grove (Iredell County) and that he (Pruitt) got three of the kilograms and D.C. Cole got four kilograms. Pruitt also told the CI that he had approximately 50 guns in a safe in his residence. (D.C. Cole is Dennis Gwen Cole III and was arrested on September 20, 2003 for marijuana distribution conspiracy. Cole received a 60 month prison sentence and five years supervised release which was terminated on January 18, 2004.)

k. On Thursday December 14, 2006 at approximately 3:49 pm, the CI went to Pruitt's residence to purchase cocaine. The CI was acting at the direction of law enforcement and was outfitted with an audio recorder. The CI stated that he went in Pruitt's residence and met with Pruitt. Pruitt went into the kitchen and the CI followed. The CI told Pruitt he wanted two ounces of cocaine and he followed Pruitt up the steps to the upstairs area and Pruitt went towards the rear of the residence and returned in a moment with the two bags (of cocaine). The CI paid Pruitt $2,400 for the cocaine and then the CI left.

l. On Wednesday, December 20, 2006 at approximately 5:36 pm, Black and the CI went to Pruitt's residence and purchased two ounces of cocaine Pruitt. The deal was pre-arranged by CI. The CI obtained $2,400 from Black and provided it to Pruitt.

---

3   Due to personal reasons, the CI was unable to assist law enforcement from April 2004 until October 2006.

6

m. On February 7, 2007, Black and the CI went to Pruitt's residence in order to purchase five ounces of cocaine from Pruitt. This deal was arranged on February 6, 2007 by a telephone call from the CI to Pruitt. Upon arriving at the residence, Black and the CI went to Pruitt's residence and could not locate anyone at the residence. Black and the CI went to the adjoining chicken houses in an effort to locate Pruitt. Upon approaching the chicken houses, Black and the CI met with a white male believed to be a relative of Pruitt. The individual stated that Pruitt told him that the CI and Black were coming to the residence, but he got tired of waiting for them and left. The individual indicated that he knew they were coming to purchase five ounces of cocaine from Pruitt and that he would tell Pruitt to hold onto the five ounces until the CI and Black could come back.

n. On March 22, 2007, Black and the CI went to Pruitt's residence in order to purchase cocaine from Pruitt. The CI and Black met a blond female approximately 23-25 years of age, approximately 5'7" present at the residence. Pruitt advised that the girl was Pruitt's new girlfriend and that she was living with him. Pruitt stated that he had a fight with the girl's ex-husband or boyfriend and that Pruitt felt that the "Law" (Wilkes County Sheriff's Department) was expected to come by his residence, therefore, he removed his cocaine to another location. Pruitt told the CI that he had the two ounces that he was suppose to sell the CI and Black, but that he had removed it from the house. The CI told Pruitt that Black had just retired from R.J. Reynolds and that he would be receiving a large sum of money and that Black wanted to purchase a ½ kilogram of cocaine. Pruitt stated he would sell a ½ kilogram of cocaine for ten thousand dollars.

o. On March 23, 2007, Black and the CI went to Pruitt's residence in order to purchase cocaine from Pruitt. Upon arriving at the residence, Black and the CI spoke to Pruitt. Pruitt told the CI that the cocaine was at "DC's" (referring to D.C. Cole) residence and that "DC" had not brought the cocaine over yet. Pruitt told the CI that he could have sold 25 ounces today if he had the cocaine and that Ricky Dancy's nephew was there to pick up 10 ounces of cocaine and was to take the cocaine to four men at a hotel in Jonesville. Pruitt stated that two of the men were from Taylorsville and other two men were from Kernersville. Black stated Pruitt brought a shotgun down from the upstairs of his residence and that the shotgun was possibly a Remington 870 pump shotgun with a camouflage stock and forearm. Pruitt told Black he was going to go shoot some new ammo. The CI asked Pruitt about obtaining a ½ kilogram of cocaine from Pruitt. Pruitt told the CI that he would have to come alone to pickup the half kilogram of cocaine because he did not trust Black. Pruitt went outside the residence with the CI and other individuals and fired the shotgun three times at a target.

p. On March 28, 2007, the CI went to Pruitt's residence and met with Pruitt. Pruitt told the CI that he had given the cocaine that he had broken down into

7

ounces to D.C. Cole because D.C. had some ounce customers. Pruitt told the CI that he (Pruitt) had three kilograms of cocaine buried outside his residence but he did not want to go get it because a person was pressure washing the siding on his house and he was afraid the person would see him dig it up. The CI stated that when he arrived at the residence, a person was pressure washing the siding on the residence. The CI stated that while at the residence, he observed three assault type rifles in an upstairs bedroom with loaded magazines for the rifles beside the rifles. The CI stated that in an earlier unrecorded telephone call with Pruitt that Pruitt state that he had recently traded cocaine for fully automatic rifles and the CI assumed that rifles in the bedroom were the ones Pruitt was referring to.

6. Based on the facts outlined in the above affidavit, you affiant believes that Pruitt has operated an on-going cocaine distribution since at least 2004 and that he utilizes his residence, 1818 Round Hill Church Road, Traphill, North Carolina as his base of operation. It is further believed, based on my training and experience, that individuals involved in narcotics trafficking usually maintain the items on attachment A. Based on my training and experience, I believe that Pruitt will possess some of the items listed on Attachment A at his residence and outbuildings on the premises known as 1818 Round Hill Church Road, Traphill, North Carolina.

7. Based on the facts outlined above, your affiant respectfully requests that the Court authorize a night/day time search warrant.

8. Also, your affiant submits that there is probable cause to believe that the real property located at 1818 Round Hill Church Road, Traphill, North Carolina, was used and intended to be used to facilitate cocaine trafficking and is therefore subject to forfeiture under 21 U.S.C. Section 853(a)(2) and 21 U.S.C. Section 881(a)(7). It is

8

therefore requested that the Court issue an order and lis pendens to be filed as record notice of the government's forfeiture interest in this property

                                                                W. Todd Elmore, Special Agent
                                                                Department of Homeland Security
                                                                United States Immigration and
                                                                             Customs Enforcement

Sworn to before me this **5th** day of April, 2007.

_____
United States Magistrate Court Judge
Western District of North Carolina

## Attachment A

1. Books, records, receipts, notes, ledgers and other papers relating to drug trafficking.

2. Papers, tickets, notes, receipts and other items relating to domestic and international travel.

3. Books, records, invoices, receipts, records of real estate transactions, tax returns, bank statements and related documents, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit keys, money wrappers, and other items evidencing the obtaining, secreting, transfer, concealment and/or expenditure of money.

4. Electronic equipment, such as computers, telex machines, facsimile machines, currency counting machines, telephone answering machines and related manuals used to generate, transfer, count, record and/or store the information described in items 1, 2, and 3. Additionally, computer software, tapes and discs, audio tapes, and the contents therein, containing the information generated by the aforementioned electronic equipment.

5. United States currency, precious metals and other financial instruments.

6. Photographs, including still photos, negatives, video tapes, films, undeveloped film and the contents therein, slides, in particular photographs of co-conspirators, of assets and/or controlled substances or currency.

7. Address and/or telephone books, rolodex indexes and any pager reflecting names, addresses, telephone numbers, pager numbers, fax numbers, and/or telex numbers of co-conspirators, financial institutions, and other businesses where a financial relationship exist.

8. Indexes of occupancy, rental and/or ownership of the premises described herein, including but not limited to, utility bills, canceled envelope, rental, purchase or lease agreements and keys.

9. Contraband.

10. Items evidencing drug trafficking, including by not limited to scales, weights, baggies, and other drug related paraphernalia.

11. Weapons, including firearms.

12. Fruits and instrumentalities of drug trafficking in violation of Title 21 USC 846, including drug paraphrenalia.